1

<pre>
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION at LONDON
                              - - -
 3
     UNITED STATES OF AMERICA,    : Docket No. 6:18-CR-032
 4                                :
                      Plaintiff,  : London, Kentucky
 5                                : Tuesday, August 25, 2020
                                  : 1:30 p.m.
 6   versus                       :
                                  :
 7   JORDAN RYAN TURNER,          :
                                  :
 8                   Defendant.   :

 9                              - - -
              TRANSCRIPT OF SENTENCING HEARING
10              BEFORE CLARIA HORN BOOM
           UNITED STATES DISTRICT COURT JUDGE
11                              - - -

12   APPEARANCES:

13   For the United States:    GREGORY ROSENBERG, AUSA
                               260 West Vine Street
14                             Suite 300
                               Lexington, Kentucky 40507-1612
15

16   For the Defendant:        ZACHARY NEWLAND, ESQ.
                               Brandon Sample
17                             P.O. Box 250
                               Rutland, Vermont 05702
18

19   Court Reporter:           KIMBERLEY KEENE, RPR
                               Official Court Reporter
20                             310 South Main Street
                               London, Kentucky  47041
21                             (606) 877-7910

22

23

24        Proceedings recorded by mechanical stenography,
     transcript produced by computer.
25
</pre>

1          (Proceedings commenced at 1:40 p.m.)

2               THE COURT:  Thank you.

3          Madam Clerk, can you please call the next case?

4               COURTROOM DEPUTY:  Yes, Your Honor.  London criminal

5     number 6:18-cr-32.  United States of America versus Jordan

6     Ryan Turner.

7               THE COURT:  Thank you.

8          Counsel, can you please state your appearances for the

9     record?

10         First, for the United States.

11              MR. ROSENBERG:  Good afternoon, Your Honor.  Do you

12    prefer counsel to --

13              THE COURT:  You can remain seated.

14              MR. ROSENBERG:  Okay.  Thank you.

15              THE COURT:  Yes.

16              MR. ROSENBERG:  Gregory Rosenberg, on behalf of

17    United States.

18              THE COURT:  All right.  Good afternoon,

19    Mr. Rosenberg.

20         And on behalf of Mr. Turner?

21              MR. NEWLAND:  Good afternoon.  Thank you, Your Honor.

22    Zachary Newland for Mr. Jordan Turner.

23              THE COURT:  Good afternoon.  And good afternoon,

24    Mr. Turner.

25              THE DEFENDANT:  Good afternoon.

1        THE COURT:  So we are here for a sentencing hearing.

2   Unless there are any preliminary issues that we need to

3   address, we will get started.

4        As you are aware, Mr. Turner, I believe it was on March

5   the 7th of 2019 when you originally appeared with counsel and

6   entered a guilty plea to Count 1 of the indictment.

7        Do you remember that?

8        THE DEFENDANT:  I do.  Yes, Your Honor.

9        THE COURT:  All right.  I want to make sure that you

10  understand how our hearing is going to proceed today.  We're

11  going to go through the presentence report.

12       It is my understanding there are no objections to the

13  presentence report; is that correct?

14       MR. ROSENBERG:  Yes, Your Honor.

15       MR. NEWLAND:  That is correct, Your Honor.

16       We would have one preliminary matter with regard to the

17  motion under seal that was filed last night.

18       THE COURT:  Yes.  And I have reviewed that.  How I

19  would like to handle that is, it is always my practice to hold

20  a sealed bench conference during every sentencing hearing.

21  This will be in advance of imposing any kind of sentence, or

22  even going through the 3553(a) factors.

23       So I thought when we got to that portion of the hearing,

24  because it will be sealed, everyone will have to be removed

25  from the courtroom.  Normally, we would hold that part of our

1    hearing as part of a sealed bench conference, but given the

2    need for social distancing, we'll simply have to clear the

3    courtroom and seal it off, and then we can address that and

4    any other motion.

5              MR. NEWLAND:  My apologies, Your Honor.

6              THE COURT:  Oh, no worries.

7        So I will review the guideline range.  I'll rule on the

8    appropriate guideline range as calculated in the presentence

9    report.  I'll hear arguments of counsel after that for the

10   appropriate sentence, taking into consideration the 3553(a)

11   factors.

12       Then I will afford, if there are any victims who want to

13   address the Court, they may do that.  And then, of course,

14   Mr. Turner, you may address the Court as well, and make your

15   statement of allocution.  You don't have to make a statement

16   to the Court, and I would never hold it against you if you

17   didn't.  But if you wanted to, you will certainly have my

18   undivided attention and as much time as you would like to make

19   that statement.

20       And then, finally, I will review the sentencing factors

21   under the 3553(a) factors and I'll describe how they influence

22   my final decision on the final sentence.  I'll impose the

23   sentence and we'll talk briefly about your rights to appeal.

24       So that's just a step-by-step of how our hearing will

25   unfold.

1         Of course, if at any time you need to speak

2    confidentially with your counsel, just let me know that.  We

3    have headsets for you all to put on, and we can turn on the

4    background noise so you can have a confidential conversation

5    if there is a need for that.  Just let me know, if there is.

6         Let me ask the United States, I understand there are some

7    identifiable victims.

8         Has the United States complied with its obligations to

9    advise those victims of this hearing and their opportunity to

10   be present and be heard by the Court?

11        MR. ROSENBERG:  Yes, Your Honor, we have.  And it is

12   our understanding there are no victims that will be addressing

13   the Court today.

14        THE COURT:  Okay.  Thank you.

15        And then, finally, before we get started any farther, I

16   do want to note there are lots of, I presume, family and

17   friends of Mr. Turner who are here in the courtroom.

18        And so I just wanted to say thank you for being here.

19   Welcome to Federal Court in the Eastern District of Kentucky.

20   I know this must be a really difficult time for all of you.

21   And I am sure that Mr. Turner appreciates your support, and

22   I'm glad that you are here.

23        I'll also ask that anyone who doesn't have a speaking

24   role, be sure that your mask is covering from your nose down.

25   We do, for the lawyers, or anyone who has a speaking role, the

6

1    Court allows those masks to be removed.  And, of course, the

2    lawyers and the Court also, and Mr. Turner have barriers in

3    front of them.

4         And if I do forget, I'll ask the lawyers and, Mr. Turner,

5    if you're able, after you get finish at the conclusion of the

6    hearing, just to take one of those wipes and wipe off the

7    space where you have been sitting.  And, of course, there is

8    also hand sanitizer for everyone's use.

9         But, again, thanks to each of you for being here.  It

10   says a lot of nice things about you.  And certainly it says a

11   lot of nice things about Mr. Turner.  And of course, I've

12   gotten to know a great deal more about him based on all of the

13   letters that have been submitted and which I have read and

14   thank you all for doing that.

15        So next, counsel, I have reviewed the following in

16   preparation for our hearing today.

17        The presentence report.  The defendant's sentencing memo.

18   The letters that were submitted in various batches and at

19   various times throughout the course of -- really, about the

20   last year or so -- from Mr. Turner's family, friends, uncles,

21   aunts, friends, folks who he's worked with and gone to church

22   with.  I have read those as well.

23        So I've read the pleadings in the case, and then the

24   addendum to the presentence report.

25        Are there any other documents that I am missing or have

7

1    somehow over looked in my preparation for our hearing today?

2        Mr. Rosenberg.

3            MR. ROSENBERG:  No, Your Honor.

4            THE COURT:  Mr. Newland.

5            MR. NEWLAND:  No, Your Honor.

6        Just, if I could note, I believe we have an agreement,

7    once the Court gets to that phase, to allow one particular

8    character witness, Mr. Dudley Hilton, to proceed out of order.

9    He is a local high school football coach and has practice this

10   afternoon, and has some time constraints.  Whenever the Court

11   is inclined to get to that portion.

12           THE COURT:  Okay.  Probably just before we hold our

13   sealed portion of our hearing.  Just remind me.

14           MR. NEWLAND:  Thank you, Your Honor.

15           THE COURT:  All right.  It looks like, then, I have

16   covered everything that I needed to review in preparation for

17   this hearing.

18       So let me ask, Mr. Newland, have you gone over the

19   presentence report and discussed it with Mr. Turner?

20           MR. NEWLAND:  I have, Your Honor.

21           THE COURT:  All right.  And do you believe that you

22   have been able to answer all of his questions regarding the

23   presentence report?

24           MR. NEWLAND:  I do, Your Honor.

25           THE COURT:  Do you believe he understand its

8

1    contents?

2              MR. NEWLAND:  I do, Your Honor.

3              THE COURT:  Mr. Turner, let me ask you.  Have you

4    read the presentence report and had enough time to go through

5    it with your counselor?

6              THE DEFENDANT:  I have, Your Honor.

7              THE COURT:  All right.  Do you have any additional

8    questions right now?  Either for me or your counsel?

9              THE DEFENDANT:  No, ma'am.

10             THE COURT:  Have you been satisfied with the advise

11   and the representation that you have received from Mr. Newland

12   in this case?

13             THE DEFENDANT:  Yes, I have.

14             THE COURT:  All right.  So based on our conversation

15   earlier, there are no objections to the presentence report.

16   And so I will adopt the facts, the information, and the

17   guideline calculations contained in the presentence report as

18   true and accurate, and I will rely on those matters for

19   sentencing purposes.

20       Mr. Turner, the presentence report will be filed in the

21   record under seal.  Because it contains personal information

22   about you, it is always filed under seal.  In the event of an

23   appeal, it will be available to the parties, to the Sixth

24   Circuit Court of Appeals and counsel, of course.

25       So in this case, let's talk about the guideline range

1   that was calculated in the presentence report.  The guidelines

2   are no longer binding or mandatory on the Court.  However, the

3   statutory mandatory minimums are.

4       In this case, the guidelines were calculated as follows,

5   and I adopt these calculations.

6       The base offense level is a 32.

7       There is a two-point upward adjustment under

8   2G2.1(b)(1)(B) for a minor between the ages of 12 and 16.

9       There is an upward adjustment of two points under

10  2G2.1(b)(3) for knowingly engaging in distribution.

11      There is an upward adjustment of two points under

12  2G2.1(b)(6)(B)(ii), and that is for use of a computer.

13      So when you add those six points in upward adjustments to

14  the base offense level of 32, we arrive at a 38.

15      It is my understanding that the United States will be

16  moving for a third level for acceptance of responsibility, and

17  along with the two under 3E1.1(a).

18      And so, Mr. Turner, you'll receive a total of three

19  points for acceptance of responsibility, which moves your

20  offense level from a 38 down to a 35 as your total offense

21  level.

22      Mr. Turner's criminal history score is a zero, which

23  places him in a criminal history category of 1.  So with an

24  offense level, a total offense level, of 35 and a criminal

25  history category of 1, Mr. Turner's guideline range is 180 to

1  210 months.  It would have been 168 to 210 months, but there

2  is a statutory mandatory minimum in this case set by Congress

3  of 15 years.  So, therefore, your guideline range, the minimum

4  becomes that statutory mandatory minimum, which is 180 months

5  and then the high end of 210 months.

6  The supervised release range, following imprisonment, is

7  anywhere from five years to life, and the fine range is 40,000

8  to 250,000.  There is a special penalty assessment of $100.

9  And let me ask you, Mr. Rosenberg, does the $5,000

10  special penalty assessment, or special assessment, apply in

11  this case?

12  MR. ROSENBERG:  I believe it does, Your Honor.  Based

13  on the production offense and the timing of the underlying

14  offense conduct.  I believe that conduct did occur after, or

15  at least part of the offense conduct, occurred after the

16  imposition of that provision.

17  But I certainly would be happy to verify that and follow

18  up with another submission to the Court.

19  THE COURT:  Sure.  You know what I will do?  In the

20  meantime, our probation officer is listening in.  Due to COVID

21  issues, he's just listening in on the hearing.  So I'm going

22  to ask him to verify that .  I believe that it does apply as

23  well, but I will consult with our probation officer and just

24  have him email me and you just to confirm that.

25  PROBATION OFFICER HALL:  Your Honor, I can confirm it

1    does apply.

2        THE COURT:  Okay.  There we go.  That was my

3    understanding as well, is that there is a $5,000 special

4    assessment, so thank you very much.

5        There is a $100 special penalty assessment.  It is also

6    my understanding that forfeiture is an issue in this case.  I

7    believe the forfeiture order has already been entered, but

8    even the final forfeiture.

9        And what about restitution, other than the special

10   penalty assessment?

11       MR. ROSENBERG:  Your Honor, to this point the United

12   States is not aware of any request for restitution from any

13   victim.  Sometimes the victims submit those directly to the

14   probation office, and we don't rely on the probation office to

15   share with us, but to this point I'm not aware of any request.

16       THE COURT:  Okay.  I'll ask our probation officer.

17   Are you aware of any?

18       PROBATION OFFICER HALL:  I am not, Your Honor.  I

19   haven't received any.

20       THE COURT:  Mr. Hall has verified that this is what

21   we would call a mandatory restitution case.  But no one has

22   requested restitution in this matter.

23       So let me ask, then.  I've outlined what the guideline

24   range is, along with the range for supervised release.  Fine

25   range.  The special penalty assessments of 5,000 and 100 and

1    then addressed restitution that has not been requested.

2        So are there any objections, for the record, regarding

3    the guideline range that I have just calculated?

4        Mr. Newland.

5            MR. NEWLAND:  With respect to the guideline range, or

6    including the fine as well, Your Honor?

7            THE COURT:  Well, the guideline range.  That includes

8    the guideline range of the fine.  So it is the guideline range

9    for imprisonment, supervised release, and the fine range.

10           MR. NEWLAND:  Your Honor, we have no objection to the

11   stated ranges.  We would rely on that portion of presentence

12   investigation report that states that Turner's unable to pay

13   fine; therefore, I ask that a fine be waived, as well as the

14   5,000 supplemental special assessment based on Mr. Turner's

15   indigence.

16           THE COURT:  Right.  Understood.

17       I'm just talking about, do you agree that these are the

18   guideline ranges?

19           MR. NEWLAND:  Yes, Your Honor.

20           THE COURT:  Okay.  Mr. Rosenberg, any objection to

21   the guideline ranges that I have calculated?

22           MR. ROSENBERG:  No, Your Honor.

23           THE COURT:  Okay.  So at this point, I am happy to

24   hear any motions for third level for acceptance of

25   responsibility.

1       MR. ROSENBERG:  Yes, Your Honor.  The United States,

2   pursuant to the plea agreement, moves to have the third level

3   off for the defendant's timely acceptance of responsibility.

4       THE COURT:  All right.  And I will grant that motion.

5       So the United States has done what it said it would do in

6   the plea agreement on this acceptance of responsibility.  The

7   only way to get the third level decrease for acceptance of

8   responsibility is by a motion from the United States.

9       They have made that motion.  I've granted that motion, so

10  you've gotten the benefit of that part of your plea agreement.

11      Any motion to dismiss Counts 2 through 4?

12      MR. ROSENBERG:  Yes, Your Honor.  Also, pursuant to

13  paragraph 1 of the plea agreement, the United States is moving

14  at this time to dismiss Counts 2 through 4 of the indictment.

15      THE COURT:  All right.  And the Court will grant that

16  motion.  Also, as part of your plea agreement, the United

17  States agreed to dismiss Counts 2 through 4.  They have made

18  that motion.  The Court grants it.  And so, Mr. Turner, you

19  have gotten the benefit of that portion of your plea

20  agreement.

21      Normally, this is the time when I would hear -- I always

22  conduct a sealed hearing as part of every sentencing hearing,

23  a sealed portion on the record.  At this time, before we go

24  into the sealed portion of our hearing, if there is a

25  character witness who has a time constraint, I would be happy

1    to hear from that witness at this time.

2          MR. NEWLAND:  Yes, Your Honor.  We would call

3    Mr. Dudley Hilton.

4          THE COURT:  Good morning, Mr. Hilton.  And, yes, you

5    may remove your mask.  And after you get finished, if you

6    could take one of those wipes and just wipe down the surface

7    of the podium, that would be great.

8          THE WITNESS:  I'm used to that.  Thank you.

9          THE COURT:  I bet.  All right.  Go ahead.

10         MR. HILTON:  I'm here today to speak on behalf of

11   Jordan.  I've known him for a long time.  I've been in this

12   business of coaching for 46 years, and he helped me for

13   several years.  And when he got out of school looking for a

14   job, he didn't know much about football, but I gave him an

15   opportunity and he handled himself well around me, and the

16   players.  I could depend on him.

17     He was just a great young man and -- and being here as a

18   character witness here for him.  I have never seen him do

19   anything out of the ordinary, as far as, you know, have to

20   stand here in the courtroom and stand up for him is just, you

21   know, it's...  since his mother asked me to speak for him,

22   it's really been on my mind last few weeks and even a few

23   months ago when I was supposed to speak.

24     I'm a man and I speak from my heart.  And I raised up a

25   lot of kids in my lifetime.  And I don't know.  I take -- I

1    take my young people serious.

2        And -- and I just, you know, we -- when I went off to the

3    college business, I told all of my players -- I was recruiting

4    them from Florida and everywhere else.  I said, "Some day

5    you're going to get in trouble.  You make sure who have

6    somebody who can stand up for you."

7        So that was the biggest thing for me to come up here for

8    Jordan because I think he deserved for me to come down here

9    and stand up for him because he always handled hisself well

10   around me.  And that's what I've always kind of preached to my

11   kids, make sure.  Some day you're going to stub your toes and

12   you need somebody to speak for you.

13       And that's why I'm here today, to speak on his behalf,

14   because he deserves my -- my speaking up for him and, really,

15   don't know everything about everything.  Don't -- I just know

16   Jordan, how he always was, from my seven, eight, or nine years

17   I was around him and watched him work with young people and

18   just do his job, you know.

19       But I didn't, you know, like I said, I -- I sit here and

20   talk all day about him, you know, but I know that -- I don't

21   know of anything anybody wants to ask me about him.  I didn't

22   know I was just supposed to -- you know, I thought some

23   questions was going to come to me, or ask me this or that,

24   but --

25               THE COURT:  I don't have any questions, but I do

1    appreciate you taking the time to come here and speak on

2    behalf of Mr. Turner.  And I'm sure that he is deeply

3    grateful.

4            MR. HILTON:  One thing that bothers me that -- you

5    know, and I try to tell my kids in growing them up, your

6    record means a lot to you.  And when you stub your toe one

7    time -- I guess it was an awful bad stubbed toe -- but if you,

8    if you never done anything before, and never done on the

9    records, that's -- that was, that would touch me on decisions

10   of what to do and how to do it because I watch these drunken

11   drivers, they get out here, and I don't know, get how many

12   different chances and all of the sudden, after about the fifth

13   that finally gets somebody killed in a carload of kids.  But

14   that all touches me.

15      But I do appreciate the opportunity to come here and

16   speak on Jordan today.  I hope that I've said something that

17   will help his situation, because I think he's a great young

18   man.

19           THE COURT:  All right.  Thank you very much.

20           MR. HILTON:  You're welcome.

21           THE COURT:  This is the portion of our hearing where

22   will we will hold a sealed conference.  And I will have to ask

23   everyone to exit the courtroom, and we're going to seal off

24   the courtroom.  And after we have concluded the sealed portion

25   of our hearing, you'll be able to come back in.  So if you

17

1    could please exit the courtroom.  Thank you.

2

3                        A PORTION OF THE RECORD

4                   WAS FILED SEPARATELY UNDER SEAL

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  At this point I'm happy to hear arguments

2    from counsel concerning what you believe is the appropriate

3    sentence in this case, including arguments under the 3553(a)

4    factors.

5        It is always my practice, Mr. Newland, you may go first

6    on behalf of Mr. Turner and argue for what you believe is the

7    appropriate sentence.

8        I'm happy to hear from you now.

9            MR. NEWLAND:  Thank you, Your Honor.  I'll wait just

10   one moment.  I think a few more people are trailing in.

11           THE COURT:  Certainly.

12           MR. NEWLAND:  Your Honor --

13           MR. ROSENBERG:  Do you have additional --

14           MR. NEWLAND:  Yes, Your Honor.  We did have

15   additional character witnesses, but I didn't want to

16   interrupt.

17           MR. ROSENBERG:  Yeah, I didn't know.

18           THE COURT:  How about if we hear from them after I

19   hear argument from counsel and right before I hear Mr. Turner,

20   if he would like to allocute.

21           MR. NEWLAND:  Very good, Your Honor.

22       Your Honor, we believe that the appropriate sentence in

23   this case is a sentence of 180 months.  That is based on the

24   fact that there is a statutory mandatory minimum.  We

25   recognize that is the low end of the guideline range because

1    of the statutory mandatory minimum for the offense.  Otherwise

2    180 months would be near the middle of the range, which would

3    have been 168 to 210 months.

4         In looking to Mr. Turner's history and characteristics,

5    we would rely on the defense sentencing memorandum.  But

6    Mr. Turner is a true first-time offender here, Your Honor.  He

7    has led an otherwise admirable life.  Devoting himself to

8    helping in the community through his acts as a teacher and his

9    acts of service through various organizations.

10        Mr. Turner has been dedicated as well to his family

11   taking extensive care of grandparents as they were having

12   medical needs in their later years.

13        If we look to the factors, Your Honor, under

14   18 U.S.C. 3553(a), (a)(2), the need for the sentence imposed

15   to reflect the seriousness of the offense, provide just

16   punishment and promote respect for the law.

17        Certainly, Your Honor, no one can argue that 15 years for

18   a first-time offense does not promote respect for the law, or

19   reflect the seriousness.  In no circumstances today will

20   Mr. Turner be receiving any sentence of less than a decade and

21   a half.

22        In looking to the need to afford adequate deterrence of

23   criminal conduct, we believe that the statutory mandatory

24   minimum of 180 months would provide significant deterrence.

25   And, in fact, the United States Sentencing Commission has

20

1    found in their January 20th -- or January 2020 report on the

2    length of sentence and recidivism, that sentences of over a

3    120 months carry between a 30 to 45 percent less rate that

4    makes people less likely to recidivate than sentences of less

5    than 120 months.

6        So in terms of specific deterrence to Mr. Turner, we

7    believe that specific deterrence will be served by the

8    significant incarceration period.  In terms of general

9    deterrence, we believe that that interest will be served as

10   well.

11       To protect the public from further crimes by the

12   defendant, we do not believe, together with the term of

13   supervised release requirement, registration as a sex

14   offender, that given the modus operandi alleged in this case,

15   that there would be any further need to protect the public

16   behind the 180-month sentence.

17       We believe that sentence factor (d), to provide the

18   defendant with training or medical care generally does not

19   apply.  Although we do recognize that he will be able to

20   receive correctional treatment with regard to some of the

21   aspects of this offense.

22       Looking at the sentence range, I believe the Court has

23   appropriately stated the sentencing range.  And just if we

24   could, Your Honor, in addition to asking for the mandatory

25   minimum here, we would ask the Court to impose a supervised

1    release term of no more than seven years.  We believe that if

2    the Court were to impose a 15-year sentence with seven years

3    of supervised release that the most restrictive portions of

4    the Court's judgment would continue for the next 22 years.

5    And beyond that, Mr. Turner would be subject to a

6    lifetime of registration and the onerous burdens with regard

7    to where he can live, the maintenance of social media

8    accounts, the jobs that he's allowed to have, a disclosure

9    will follow him for the rest of his life.

10   So supervised release, beyond that period, we do not

11   believe would be sufficient, but not greater than necessary.

12   We would ask the Court to waive imposing any fine because

13   Mr. Turner, as the PSR notes, is unable to pay any fine.  The

14   same is true with the special assessment, the $5,000 one.  We

15   would ask the Court find that Mr. Turner is indigent.  We

16   would ask that the Court recommend that the BOP place

17   Mr. Turner in an appropriate facility as close as possible to

18   Pineville, Kentucky, where Mr. Turner is from.

19   And we would specifically ask the Court recommend to the

20   Bureau of Prisons that Mr. Turner, at the appropriate time,

21   receive maximum amount of placement in a residential re-entry

22   center, commonly known as a halfway house.

23   We understand that recommendation is certainly in no way

24   binding on the Bureau of Prisons, but the Bureau of Prisons,

25   under their program statements, will take the Court's

22

1      consideration with regard to RRC placement into account if it

2      is made at the time of sentencing.

3          We believe that Mr. Turner's extensive history with

4      substance abuse is laid out in the PSR and, unfortunately,

5      those are things that Mr. Turner is going to have to seek

6      treatment for it and try to deal in an incarcerated setting.

7          But Mr. Turner respectfully requests that the Court grant

8      mercy and sentence him to no more than absolutely necessary at

9      180 months.

10             THE COURT:  All right.  Thank you.

11         Mr. Rosenberg, I would be happy to hear from you on

12     behalf of the United States.

13             MR. ROSENBERG:  Thank you, Your Honor.

14         The Court has noted the substantial support that is

15     reflected in the courtroom today, and I think that is credit

16     to the folks, the family and friends, because that is a

17     difficult thing to do in any time, especially in our current

18     situation.

19         And the Court will notice that there isn't a victim here

20     to speak to the Court today, but that's not uncommon in these

21     kinds of cases because part of the seriousness of the offense,

22     the harm caused by the action done, is the shame that this

23     conduct inflicts on the most vulnerable that our society has,

24     our young children.

25         Children whose brains have not yet fully developed.  It

1    is something that courts hear in the sentencing context quite

2    a bit.  We talk about recidivism and seriousness of conduct

3    done at a time young age.

4        Well, the flip side of that is, when victims are young,

5    it has a significant impact on the rest of their lives.  And

6    often we don't see the full consequences of this offense

7    conduct for years to come.  They don't manifest themselves for

8    many years.

9        So I want the Court to know that, just because there is

10   not a victim here in front of the Court, that does not take

11   away from the seriousness of this offense, the damage that it

12   has caused, and the need for a sentence to reflect that

13   seriousness, to reflect that harm, to impose a just punishment

14   for that harm.

15       Certainly this is a seriousness offense.  Congress has

16   saw fit to ensure that substantial penalty would be guaranteed

17   in these cases, because Congress has made a value judgment on

18   behalf of society that some conduct is just so serious that we

19   need certain and significant penalties to attach to them.

20       So to assert that somehow imposing the sentence will in

21   any way not promote respect for law, I have real trouble with

22   that, because, certainly citizens may disagree, as a policy

23   matter, about mandatory minimums and what should and should

24   not trigger those and where they should fall.  We have a

25   process.  We have a democratic process, and that democratic

24

1       process created a mandatory minimum for this offense.

2           So nothing that the Court will impose today will

3       undermine promoting respect for the law.

4           The United States is going to recommend a sentence of 188

5       months, which is just below the middle of the "but for" range

6       I'll call it, if the mandatory minimum was not in play.

7           It certainly is below the range of the adopted guideline

8       range of 180 to 210.  It is below the middle of the range.

9           I don't believe sentencing this defendant at the very

10      bottom of the range comports with 3553(a) and I would like to

11      talk a little bit about that.

12          One of the factors the Court has to consider in imposing

13      a sentence is the concept of disparity.  So here the Court is

14      being asked to sentence this defendant as the very least

15      culpable to the offender of child pornography, child

16      production offenders.  That means he should be sentenced at or

17      below the same level as other offenders who did not solicit

18      child pornography production from multiple children.  He

19      should be sentenced at or below other offenders who did not

20      use their position as a teacher and a coach, someone trusted

21      in the community, to prey on a child.

22          The government seriously considered whether the 3B1.3,

23      abuse of position of trust adjustment should apply in this

24      case.  I think it was a fairly close call there.  And even

25      though the government did not pursue an adjustment, certainly

1    under 3553(a), the nature and circumstances of the offense,

2    includes the fact that the defendant used his position, used

3    the trust that both the children and their families had in him

4    as a means before accessing and, indeed, as we see from the

5    actual communications to this child, leveraging that authority

6    and that position of trust to try to coerce this child into

7    producing child pornography.

8         The Court has already heard someone describe this as, if

9    you stub your toe once, it's a one-time thing.  You shouldn't

10   have to face such serious consequences on just the first time

11   you mess up.

12        But this was not a one-time, just a mistake, a one lapse

13   in judgment.  The plea agreement makes that clear.  The PSR

14   makes that clear.

15        And even with the particular local victim at issue here,

16   that was not a one-time event.  He started, according to the

17   Facebook records, he started these communications on this, on

18   this pressuring, this pressure campaign to get this child to

19   take pictures of his own penis and send it to the defendant

20   for the defendant's sexual gratification.  He started that

21   campaign in February of '18.

22        And he uses the insecurities and vulnerabilities of a

23   middle school boy, preys on the very things that a child at

24   that age is so wrapped up in, these ideas of masculinity and

25   just dealing with your own body that's changing as a child.

1        He preys on that to get -- to try to get what he wants.

2        He reiterates that.  It starts with insulting this child

3    about the size of his penis, and then quickly transitions to,

4    "Well, there's only one way to prove that what I'm saying

5    about your small penis is wrong."

6        And he assures him, "Well, we'll delete the pictures once

7    it's over.  Don't worry.  It's the only way to prove it, you

8    sissy."

9        Now, when Kentucky State Police first confronted

10   Mr. Turner about this, because the child's mother discovered

11   the conversations in Facebook.  Mr. Turner (A) told the

12   officer this was just a joke.  It was just a running joke.

13   Some other kids had made fun of him in basketball practice,

14   and it was just a -- we were just kidding.

15       He also told KSP that they would find no child

16   pornography on his phone.  Neither of those assertions were

17   true.

18       The messages made clear that this was not just joking and

19   teasing.  Jordan Turner specifically asked the victim, "You

20   got Kik?"  That's K-I-K.  Kik Messenger.  The very app that,

21   at the same time, he was pressuring this local child to

22   produce child pornography, he was using Kik Messenger in

23   conjunction with another application, called Omegle, to find

24   other children, other young boys, to do the same thing.

25   Produce images and videos of their penises to send to the

1    defendant.

2         So why is he asking this local victim whether he could

3    get on Kik if this is just joking around, just harmless

4    teasing?

5         And if it was harmless teasing, why revisit this pressure

6    campaign a month later in March of 2018?  And I think there is

7    something really revealing about the March exchange.

8         The victim, as Turner once again reintroduces subject.

9    He says, "You remember that bet we had the last time?"  And

10   the child's response was, "Shut up.  My mom's in a tight spot

11   right now."  Turner tells him, "You ain't getting off the hook

12   that easy."  But then asks him, "What do you mean?"

13        And the child says, "She's kind of in jail at the

14   moment."  And Turner says, "Oh, I'm sorry, man."  And yet,

15   less than ten minutes later, the conversation is back to,

16   "Don't think I'm letting you off the hook."  And once again,

17   it's, "We're going to settle you talking that crap that we

18   were going to do before.  It is going to be funny.  Quit being

19   a girl and we will settle it and delete, but you talk too much

20   smack."

21        And on it goes on.  "For real.  Don't be sissy.  Don't be

22   sissy.  It will be funny, and we'll delete as soon as we are

23   done."

24        "You're not going to get away with that.  I'm going to

25   beat you.  So when you're done talking to her,.."  the child

was trying to get off this conversation telling Mr. Turner that he was talking to another girl.  So Mr. Turner says, "When you're done talking to her, we are going to settle it, just for fun.  Don't talk trash and not back it up.  So when you get talking is over, or you're admitting you're wrong and lying.  So just say, yeah, and finally man up and prove it."

The child, multiple times, says, "I don't want to do this.  This is weird."  And Mr. Turner says, "No, it's not. It's just competition.  Don't make a big deal of it.  Not weird."

"Bro, quit being a sissy.  It's just competition and we will delete when we are done.  Then it's settled.  You talked the trash."

On it goes for another hour.

It is certainly fortunate that this child, the local child here, did not, in fact, produce an image.  Did not produce an image that Mr. Turner could then turn and distribute to other individuals through Kik Messenger, which is something that he did.

As the PSR gives an example of Mr. Turner, in April of 2018 -- so just a couple of weeks after this second conversation with the local victim -- he discusses trading child pornography with another individual that he's talking to on Kik Messenger and, indeed, receives an additional photo of a teenage boy's penis and, in return, sends a video of a

1   teenage girl where the video depicts the minor, the girl,

2   masturbating.  The video that certainly qualifies as child

3   pornography.

4       So when we look at this offense conduct, the government's

5   assessment is that this simply is not the very least culpable

6   child pornography producer.  Certainly it's not the most

7   culpable, and his guideline range reflects that.

8       But does the fact that he was employed and was involved

9   in coaching children, does that mitigate here?  I don't see

10  how it can mitigate very much, given that it was that very

11  position that he took advantage of to commit this crime.

12      This was not a one-time mistake.  His Kik Messenger

13  communications go back to 2017.

14      The fact that this was an attempt is not a mitigator

15  because the only thing that separated the attempt from the

16  completion was that young boy's fortitude to resist when this

17  defendant over and over and over preyed on every insecurity he

18  had, to get him to produce child pornography.  Thankfully,

19  that child was able to resist.

20      But does the fortitude of that child somehow call for a

21  lower sentence for this defendant?  No.  I mean, the law

22  treats attempt like complete offenses for a reason.  The

23  defendant did everything he needed to do to complete the

24  offense.  It simply did not complete here because that child

25  was able to resist.

1        Certainly, the guideline range here is a serious penalty,

2    and we believe the conduct justifies that.

3        We believe the factors in his favor we recognize that he

4    was a criminal history category zero.  And that's one of the

5    factors that keeps my recommendation from being higher than

6    the range.

7        But we do not think that it is sufficient to categorize

8    this defendant as the least culpable child pornography

9    producer.

10       We believe a substantial period of supervised release is

11   necessary here.  Given the defendant's young age, we believe

12   that he'll still be fairly young when he gets released from

13   prison.  And this conduct is just so difficult to detect, so

14   difficult deter that we believe a ten-year period of

15   supervised release is called for here.

16       And we would urge the Court not to adjust the terms that

17   it thinks is appropriate to address the purposes of sentencing

18   and supervised release based on suppositions about what other

19   duties may be imposed on the defendant 15 years from now.

20       Certainly laws change.  State law change.  State law

21   requirements change.  So to constrain this Court's -- in terms

22   of supervised release based on expectations of what the

23   defendant may face in terms of registration, whatnot.  I think

24   that is a misguided motive analysis.

25       I think this Court is responsible for this defendant,

1    imposing the appropriate sentence on this defendant, including

2    the terms of supervised release and its getting into the

3    prediction of what the situation will be 15 years from now I

4    think is unwarranted.

5         We also would argue for imposing the $5,000 special

6    assessment.  The fact that a fine was not recommended here is

7    not the same as a finding of indigence.  Certainly, the

8    guideline range on the fines were different than this special

9    assessment here.  And the fact than this defendant has

10   retained at least three attorneys through the course of this

11   representation, I think undermines the assertion of indigence.

12        Congress put in this special assessment for a reason.  It

13   is targeted specifically for this type of offense.  So to come

14   now before the Court, after having been gainfully employed.

15   Having the full support of his family and to say, well, now

16   the money has run out.  Now that it's time for money to be put

17   towards helping those children who are victimized by this

18   conduct, that's the point where the money runs out.  I think

19   some further showing would have to be required rather than

20   just taking on counsel's representation well, now that the

21   money would no longer serve himself, the money has run out.

22        So we would ask the Court on this record to impose the

23   $5,000 special assessment.

24        With that, we respectfully ask the Court to impose a

25   sentence of 188 months, followed by ten years of supervised

1    with release with the standard terms for supervised release

2    for sex offenders in this district, and the $5,000 special

3    assessment.

4         Thank you.

5         THE COURT:  All right.  Thank you.

6         Anything further, Mr. Newland?

7         MR. NEWLAND:  Yes, Your Honor.

8    Mr. Turner would strenuously object to the Court

9    considering him exercising his constitution right to counsel

10   of his choice in retaining attorneys in whether or not

11   Mr. Turner has the present ability to pay the $5,000 special

12   assessment and weather or not Mr. Turner is indigent.

13       In fact, the Court has accepted the findings of the

14   presentence report.  The government had an obligation, as did

15   the defense, if those facts were untrue to put contrary facts

16   in front of the Court.

17       And the probation officer who interviewed Mr. Turner,

18   looked at Mr. Turner's finances, Mr. Turner, who has been

19   incarcerated since 2015, said that Mr. Turner is unable to pay

20   a fine.  There are no indications in front of the Court that

21   Mr. Turner is, in fact, able to pay the special assessment of

22   $5,000.

23       And that Mr. Turner, who is incarcerated, who is jobless,

24   who had money previously, as shown in paragraphs 74 through

25   77, has spent those funds in order to pay his attorney fees.

1      Mr. Turner is currently indigent, Your Honor.  That's the

2   analysis that the Court should engage in.  And the premise

3   that, quote, now the money has run out, or the time to help

4   the children is now and now there is no more money is frankly,

5   Your Honor, offensive.

6      The government has no involvement whatsoever in the

7   retention of Mr. Turner's counsel.  Has no involvement or

8   knowledge about the particular financial circumstances of

9   Mr. Turner retaining either myself or any prior counsel, Your

10  Honor, for that matter.

11     And frankly, Your Honor, the point of restitution is to

12  make the victims whole.  That is the point of restitution in

13  this scheme, not the point of the $5,000 special assessment

14  here.

15     And to the extent that restitution is called for -- it is

16  mandatory, and Mr. Turner does not seek to avoid that

17  obligation, Your Honor.  Mr. Turner has not run from the

18  music, Your Honor.

19     And as we have talked about previously, Mr. Turner, has,

20  in fact, done everything to own up since Mr. Turner went into

21  custody.

22     So, Your Honor, we would ask that the Court find that

23  Mr. Turner is indigent.  And we would object to any

24  consideration of his exercising his right, his right to

25  counsel of his choice in the Court's determination of whether

34

1    or not he is indigent for purposes of the special assessment,

2    or purposes of, frankly, the fine, Your Honor.

3            THE COURT:  All right.  Anything further?

4            MR. NEWLAND:  Just --

5            THE COURT:  I'm sorry.

6            MR. NEWLAND:  Just the character witnesses, Your

7    Honor, but nothing further --

8            THE COURT:  Yes.

9            MR. NEWLAND:  -- from me.

10           MR. ROSENBERG:  Nothing from the United States.

11   Thank you.

12           THE COURT:  All right.  So if, in fact, any of the

13   victims in this case had decided to appear in court, then I

14   would have provided this opportunity to those victims to

15   address the Court.

16       I'm going to remind everybody unless you have a speaking

17   role, please pull your mask up above your nose.  Thank you.

18       So given that there are no victims who wish to be present

19   and make a statement, at this time I will hear brief

20   statements from any additional characters witness.

21           MR. NEWLAND:  Your Honor, at this time Mr. Turner

22   would call Ms. Jennifer Locke.

23           THE COURT:  Hello, Ms. Locke.

24           MS. LOCKE:  Hello.

25           THE COURT:  If you could, just state your full name

1    and maybe spell it for our court reporter just so she has your

2    full name and speak right into the microphone.

3         MS. LOCKE:  Okay.

4         THE COURT:  Thank you.

5         THE WITNESS:  My name is Jennifer Locke, L-o-c-k-e.

6    And just a few days ago, Your Honor, I wrote this letter

7    and I don't think Jordan has seen it, or heard.  But I would

8    like to, if I could, just brief read what I -- my thoughts

9    were, and have been, for the past two or three years.  I wrote

10   this to you, actually.

11        Honorable Boom, my name is Jennifer Locke.  I am writing

12   this character witness statement on behalf of Mr. Jordan

13   Turner, my long-time friend and acquaintance.  The following

14   represents my association with Jordan Turner from his birth in

15   1988 until the present time, August of 2020.  I appreciate the

16   opportunity I have been given to share some of the knowledge

17   that I have pertaining to the character of Jordan and I pray

18   that my words may allow Your Honor the opportunity to gain

19   further insight pertaining to Jordan Turner's true character

20   and personality.

21        Jordan Turner was born March 1988, three months prior to

22   my oldest son's birth.  I was a high school classmate of

23   Jordan's mother, Debbie.  Debbie and I have remained close

24   friends since those high school years almost 50 years ago.

25   And we have shared many triumphs and tragedies, joys and

sorrows throughout the decades.

My association with Jordan for 32 years has been experienced through countless childhood activities and events. Numerous family and friend gatherings and a host of school functions.  I have been able to observe and interact with Jordan in various settings and have learned of character through the years, from his childhood through his adolescence, as a young adult, as a student, as a teacher, as a son, as grandson, as an uncle, as a nephew, and as a community member and leader.

From Jordan's childhood into adolescence, through young adulthood and into his college years, I have seen Jordan Turner's kind and compassion character displayed on many occasions where Jordan would always fight for the underdog or the less fortunate.

From what I have observed, Jordan always wanted all the people he associated with to feel as if all their lives mattered.  His path in attempting to be a friend to all was rooted in his early childhood years when he would share with his mother that some of his school friends needed help.  He wanted to help his friends and recognize and desired to share his substance with those less fortunate.

Jordan's inter most feelings were those of a person that believed in the phrase "where much is given, much is expected." Jordan would reach out and give of his substance

his time and his energy to those less fortunate on countless
occasions.

Jordan would feed the less fortunate.  He would offer
help to help those less fortunate families by way of helping
with their chores, buying clothing and needed items for the
members of those families, giving rides as needed and inviting
them to various social events.

I believe Jordan felt he had a calling to actively reach
across the aisle and look beyond the surface of a person,
offering himself as a true friend and as an empathetic giver
of his time and talents.

I believe that Jordan feels that same calling today, and
continues to look beyond his own adversities to lift another
long path.  I believe that Jordan is lifter of people during
their times of need, and I believe that Jordan is thankful for
his adversities in which to even more acutely be able to
connect with the downtrodden and less fortunate.

As a teacher and high school coach, Jordan continued his
recognition of uplifting of those less and fortunate ones.
During the coaching years, regardless of the pressure of
winning a game, or the pressure from some of the parents
demanding that their children be continually played in each
game, Jordan would look to the less fortunate, less talented
and less recognized players and give them a chance to be a
part of the whole.

1      Jordan prayed to know how to help make each player feel

2    important and accepted.  Jordan, during those stressful years,

3    sought the guidance of God in order to do the right thing for

4    his players and his players' families.  His was not just a job

5    or that ended around 3:30 p.m. daily.

6      Jordan felt calling to uplift and really be a friend to

7    all.  During any hour of day or night, his phone was always on

8    and his door was always open.

9      As a son, a grandson, an uncle, nephew, Jordan has shown

10    deep concern and love for the members of his family.  Jordan

11    cared for his grandfather during his grandfather's years of

12    failing health.  Jordan would make sure he visited and helped

13    daily during his grandfather's illness.

14      During his grandmother's later years, after his

15    grandfather passed away, Jordan was there at any time to offer

16    his assistance, whether it was through uplifting

17    conversations, running errands, doing chores, or whatever

18    needed to be done.

19      Jordan is devoted a son and family member.  He has

20    continually worried and grieved continually over how his

21    actions have affected his family, and has prayed for his

22    family during this extremely difficult and devastating time

23    period.

24      I believe Jordan Turner is deeply spiritual and

25    compassionate individual that feels extreme sadness and shame

for his actions.  I believe that Jordan desires to rise above his past behaviors and walk the path of forgiveness, acceptance and rehabilitation, offering hope and help to others along with himself.

I believe that Jordan, if offered the opportunity to help others, will rise above this devastating hardship and will be able to be a spiritual leader and an empathetic teacher, helping those experiencing much anguish and hardship, addiction and pain.

It is my belief that Jordan will take that life altering and extreme sad situation and be able to make his life, going forward, one of wholesome success, with a continued mission of helping others heal from their broken spirits and broken lives.

With God's help and Jordan's determination, compassion, humbleness and acceptance of a broken heart, and a contrite spirit, all things are possible.

I pray Jordan may have a chance to be guiding light to others that so desperately need that guide light.

Thank you, Your Honor, for the opportunity for allowing me the chance to tell a little bit of what I believe Jordan to be.

I believe that he does represent a humble and sorrowful individual.  And I believe that he desires to right his wrongs.  I believe that if he has the opportunity to forge a

1    wholesome, good and service-minded compassionate path, he will

2    help others along the way based on what he has experienced.

3         Thank you, Your Honor.

4         THE COURT:  Thank you very much, Ms. Locke.  I really

5    appreciate that.

6         Mr. Newland, anyone else?

7         MR. NEWLAND:  We have three more people.  We would

8    call Ms. Thomasa Risner.

9         THE COURT:  Hi, Ms. Risner.  If you would not mind,

10   please state your name and spell it for our court reporter so

11   she has your full name.

12        MS. RISNER:  Okay.  My name is Thomasa Risner.

13   T-h-o-m-a-s-a.  Risner.  R-i-s-n-e-r.

14        THE COURT:  All right.  Thank you.

15        MS. RISNER:  I'll live in Middlesboro, Kentucky and I

16   am a member of the Binghamtown Baptist Church, and that's

17   where Jordan attended church.  Now, he was there from the time

18   he was in high school and even before, probably, on and off

19   ten straight years.  I don't know.  I didn't keep a record,

20   but he was there.

21        And I have heard all of this stuff, which I wish I didn't

22   have to hear.

23        But that's not the Jordan that I know.  The Jordan that I

24   know would walk in here in a suit, and be an example to

25   people.  So, obviously, something has went wrong.

1       But also I know Jordan's personality enough to know that

2   he is a repentive person and he is willing to get help.

3       But putting him and making him a prisoner is not going to

4   help him.  And that's what he's been the past two years.  He

5   was in our youth group.  He led part of the youth group, as

6   far as, like, when we would go to camp, he would be there to

7   help.  He would be there to do the games and the fun things.

8   He was making sure the kids were all in their places at the

9   end of the day.

10      And Bible camp is a very strenuous exhausting thing for

11  the people that's trying to keep all of them intact.  So he

12  proved hisself as a leader there.

13      And, basically, I'm just begging you to give this young

14  man a chance again.

15      I do not agree at all, which I guess it's none of my

16  business, with the recommended sentence for this type of

17  crime.  Myself.  And I know I probably shouldn't say that.

18      But I think that it is way, way out there.  If there had

19  been any physical contact, as a teacher of 25 years, you know,

20  I would say slammer them.

21      But there was no physical contact, and these young boys

22  will get over this.  And that's all I would like to say.

23           THE COURT:  All right.  Thank you.

24  Mr. Newland.

25           MR. NEWLAND:  Yes, Your Honor.  We would call

1    Jordan's aunt, Ms. Sharon Collette.

2              THE COURT:  All right.  We'll let Ms. Risner finish.

3    Thank you.

4              Hello.  Good afternoon.

5              MS. COLLETTE:  Good afternoon.

6              THE COURT:  You may remove your mask while you're

7    speaking.  And if you would, just state your name and spell it

8    for our court reporter so she gets a down accurately.

9              MS. COLLETTE:  My name is Sharon, S-h-a-r-o-n,

10   Collett, C-o-l-l-e-t-t, and I am Jordan Turner's aunt.

11       I'm also his primary grade teacher.  I'm going to try not

12   to cry.  I've cried for two and a half years.

13             THE COURT:  Yes.  Understood.  Just take your time.

14   We have tissue if you need any tissue.

15             MS. COLLETTE:  I'm okay.  Thank you.

16       Jordan and I are very close.  Thank you.

17       I only have one child, a daughter, so Jordan is the son I

18   never had.  He's -- the picture that was painted is not the

19   Jordan that I know.  The Jordan I know has a big heart.  He's

20   thoughtful and he's a considerate young man, always willing to

21   help others.  And I'm sure that the letters that you have had

22   the opportunity to read, you got to see lots of examples of

23   his good deeds, and I have a few that I would like to mention.

24       One of them that comes to mind is one evening when Jordan

25   was, they were coming from Knoxville, Tennessee.  They came

1    upon a car accident and rescue squad, police, no one had

2    arrived except Jordan and another vehicle.

3        The vehicle that had the accident was teetering on a

4    ravine, just ready to go over.  And the man from the other

5    vehicle told Jordan, said, "If you can go under there and

6    support that truck, just enough, I can get the lady out before

7    it goes on over."  And Jordan did.  Didn't know the lady.  But

8    he was willing to risk his safety, his life for a person he

9    didn't know.  He told his mom, he said "I don't know how I did

10   it.  I guess just adrenaline."  But he was successful with

11   that.

12       My husband had a heart attack a few years ago.  A massive

13   heart attack.  He was unable to work for eight months, and

14   Jordan volunteered to drive my husband's coal truck after work

15   and on Saturdays.  He had never driven a truck before.  But my

16   nephew, Jordan, volunteered.  My husband, none of his friends,

17   none of his family volunteered to help us.  But Jordan did

18   that so we would continue to have an income and not lose my

19   husband's haul.

20       But the thing that stands out the most in my mind, and

21   it's forever frozen there, is one evening Jordan and I were at

22   my parents.

23       And my dad knew he didn't have long to live.  And he

24   reached his hand out to Jordan, and Jordan was in a chair and

25   he got daddy's hand and he got down on his knee beside the

44

1    chair and daddy said, "If, Jordan, when something happens to

2    me, will you take care of your Nana?"  And Jordan said, "I

3    will."  And a few months later daddy did pass away.  Every

4    evening after work, Jordan would come to the house, have

5    supper Mother, then sit and watch T.V. together, and then it

6    was bedtime.  She would go to bed and Jordan would go home,

7    only to return the next evening and do the same thing.

8        There was some days that he had errands to run.  And my

9    mother is a petite little lady.  Jordan had a big-four wheel

10   drive truck.  He would put that little lady in the truck with

11   him, and off they would go on the errands, so he kept his word

12   to his grandfather.

13       But Mother now is in the final phase of dementia.  But

14   she doesn't know me most days, but Jordan can call his mother

15   and Mother can hear his voice and she knows it's Jordan.  And

16   she remembers his name.

17       I'm asking for leniency.  And I know when we do wrong,

18   society requires that we be punished and Jordan's been

19   punished for two and a half years, and so has his family.

20       Thank you.

21            THE COURT:  Thank you.

22       Mr. Newland.

23            MR. NEWLAND:  Your Honor, at this time we would call

24   our last witness, Jordan's mother, Debbie Mills-Turner.

25            THE COURT:  I'll ask you, as well, just to -- and you

1    can remove your mask.  Just to spell your name for the court

2    reporter.

3              MS. MILLS:  It's Debbie Mills.  D-e-b-b-i-e,

4    M-i-l-l-s.

5              THE COURT:  Thank you.

6              THE WITNESS:  I had no idea I would be speaking

7    today.  It's a position a mother should never be in.

8         I can't tell you enough good of my son, and I want to

9    tell you about him being a coach.  It wasn't because he preyed

10   on children.  I remember one particular time him telling me,

11   he said -- we were going to go a ball game, mom.  It was on a

12   Wednesday night.  It was church service.  And he said it was

13   my opportunity to witness to those boys, and he said, he -- he

14   said, "Mom, I told them," said, you know, "This, you might

15   think is, the most important thing is this ball game, but what

16   was most important thing is that you know the Lord."

17        I had to teacher come up to me right after this, his

18   arrest, and said, she said, "Jordan.  Jordan."  He said, "He

19   helped me."  She said, "He put kids on a team that couldn't

20   play."  She said, "If they didn't have money, then he would

21   give them money."

22        And he -- I can't -- I can't explain.  I could never put

23   into words the pain or the hurt that I live with every second

24   of my life.  It doesn't get any better.  It doesn't go away.

25   Please have mercy on us.  Please have mercy on us.  Jordan is

1    a wonderful young man.  He's not what Mr. Rosenberg painted

2    him out to be.  No.  No.  He's not.  And his love was

3    basketball and church and gospel music.  And that's what got

4    him through at the end of the night.  He's -- he's held me and

5    I said, "I don't understand all of this suffrage, Jordan."

6    And he said, "Mom, haven't you read the Book of Jobe?"  And I

7    said, "Well, I know I've spent more than 40 days and nights in

8    they wilderness."  He said, "There's a lot more to it than

9    that."  And he began to explain the Book of Jobe."

10       But he -- please don't take my child away from me.

11   Please don't take my child away from me.  And he shouldn't be

12   punished because he's a teacher, because he's a coach.

13       THE COURT:  Make sure and address your comments to me

14   and not to anyone else.

15       THE WITNESS:  He loved basketball.  And he loved

16   basketball, and he loved gospel music, and he loved the Lord.

17   And I've gotten letters and phone calls and messages from

18   other inmates telling him, telling me what help he had been to

19   him, that he had been to others in there.

20       Please have mercy on us.  I live with this every second

21   of the day.  It never goes away.  It never gets any better.

22       That's all I've got to say.

23       THE COURT:  All right.  Thank you, Ms. Mills.

24       This is the part in the hearing where, Mr. Turner, if you

25   would like to make a statement to the Court, you may do that.

1    It is called your right of allocution.  And certainly you'll

2    have as my undivided attention and as much time you as would

3    like to make if you would like to make a statement.

4            THE DEFENDANT:  I'm going to try, Your Honor.  Just,

5    you may have to be -- you may have to be patient with me.  I'm

6    going to try my best to get through this.

7            THE COURT:  Certainly.

8            THE DEFENDANT:  I realize that there is nothing that

9    I can say here today, nothing that I could do to take away the

10   hurt and the pain that I have caused.

11       I know that people will probably look at this situation

12   and think that they know who I am, or assume that they know

13   who I am, but this is not who I am.

14       And I hope that the people that's in this courtroom,

15   especially the ones that know me the best in here, know that I

16   never intended to hurt anybody.  That was never my intention,

17   but that's what I did.

18       And I hurt people, including the ones that care about me

19   the most.  I let addiction take me down a path that I never

20   thought that I would go, and lead me to a place that I never

21   thought that I would be.

22       But I think that it's important to say, that that's not

23   an excuse.  I do take full responsibility for my actions.  I

24   want to ask forgiveness and apologize to any victims in my

25   case.  I want to apologize to my family, and I want to

1    apologize for bringing this matter into your courtroom today.

2        I probably don't deserve mercy and forgiveness, but

3    that's what I'm asking for.  And I can -- I can only hope for

4    another opportunity to get out and live a productive life.

5    And I can promise everybody in this courtroom today that I

6    will use every opportunity that I can while I'm incarcerated

7    to better myself and come out a better person.

8        And I definitely want to thank the ones that have stood

9    by me through this process.

10        THE COURT:  All right.  Thank you.  I appreciate your

11    statement, Mr. Turner.

12        So it is the Court's job now to impose a sentence that is

13    sufficient, but not greater than necessary, to comply with the

14    purposes that Congress set out in its sentencing statutes.

15        And I'm required in every sentencing hearing to review

16    those factors under 3553(a) and to try to individualize the

17    sentence or make it fair specifically to this defendant rather

18    than simply adopt the guideline range.

19        And so I want to go through those factors and discuss how

20    they affect my thinking in this case.

21        Of course, the Court has heard the arguments of counsel.

22    I have heard the statements of some of Mr. Turner's friends

23    and family, and I certainly appreciate your statement to the

24    Court as well.

25        I've also reviewed all of the information in the

1   presentence report.  I have read all of the letters that were

2   submitted to the Court in this case, along with the pleadings

3   in this case.

4       So I want to talk about the factors under 3553(a).

5       First, the history and characteristics of the defendant.

6   Mr. Turner had a good childhood.  It's obvious he had a good

7   home and great support network.  His parents were divorced,

8   but he had a very stable home.  I understand that you were a

9   special ed teacher.  Of course, I've heard and read about your

10  work as a basketball coach as well.

11      It is clear from the letters that there are some very

12  positive attributes that you have, Mr. Turner.  The letters

13  talk about how kind you are, how supportive you are of your

14  family, of the tender care that you took of grandfather and

15  then your grandmother after your grandfather passed away.

16      The acts of kindness that you have done throughout your

17  work with your church, when you ran upon the wreck and many

18  other acts like that.

19      And you have no criminal history.  The fact of the matter

20  is, you know, I guess no one is either all good or all bad.

21  We're each a jumble of both.  And at least I've never met

22  anyone who is all good or all bad, and the same is true for

23  you.

24      We have heard a great deal about the good side of

25  Mr. Turner, and all of the good acts, the kindness, the

1    devotion and the care that you took of a lot of people.

2        But you also had a sinister side and that caused you to

3    prey on children for your own sexual gratification.  That's

4    the side that the Court must also consider, which is the

5    requirement of just punishment.

6        What I do everyday in sentencing hearings like this is

7    really balance the age old truth versus grace, right, and

8    justice falls somewhere in the middle.

9        In this case it is simply tragic to view the pain that

10   has been caused not only to your family, which is palpable in

11   the courtroom -- and we all feel deeply for your family who

12   has been harmed and is grieving because of the loss of you, at

13   least the physical separation that they have from you.

14       But there is tragedy in the victims in this case as well.

15   And those folks are suffering.  Victims of child sex abuse,

16   whether they have been touched or not, suffer those scars

17   sometimes for the rest of their lives.  And those are often

18   invisible scars that sometimes never heal.

19       The Court is very mindful and saddened by the pain that

20   has been caused to your family, but that is not the only pain

21   that has been caused in this case.  And so the Court cannot

22   lose sight of that as well.

23       And moving on to the other factors.  I've talked about

24   the history and characteristics of the defendant.

25       I must also talk about the nature and circumstances of

1    the offense and its seriousness.

2        Certainly much of what Mr. Rosenberg said is accurate.

3    You used your position of influence and trust to prey on these

4    middle-schoolers, middle-school boys who were in the throes of

5    the most insecure times in their lives, and there was

6    significant manipulation in that.

7        And no doubt, you were also being influenced by addiction

8    that you were suffering during that time.  But that -- that

9    might be a reason, but it is certainly not an excuse for the

10   conduct.

11       It wasn't just the local victims, but also many more

12   victims of child pornography who were on your phone.  The

13   pictures from the Kik application, and Omegle.

14       And every time, you know, this is not a victimless crime.

15   Every time those pictures are viewed, those children are

16   victimized again and again.  And they have to live with the

17   knowledge that they might be victimized thousands and tens of

18   thousands, hundreds of thousands of times in the future.

19   Those scars sometime never heal.

20       So the Court has considered the nature and circumstances

21   of this offense and its seriousness.

22       The Court must also consider the need to promote respect

23   for the law and to provide for just punishment.  I have

24   considered those factors in this case and talked about them

25   already.

1      I also agree with Mr. Rosenberg that sometimes those

2   scars include the shame, where there should be no shame.   But

3   a shame that continues throughout these children's lives, and

4   often effects them in very unhealthy ways in every

5   relationship that they have in the future.

6      The Court has discussed the need for just punishment and

7   I agree that in this case Congress has set a value judgment on

8   what that is.   There is a steep mandatory minimum in this case

9   for many of the reasons that the Court has articulated.

10      I have considered the need to afford adequate deterrence,

11   I think certainly anywhere within the guideline range would

12   provide adequate deterrence to criminal conduct and also

13   protect the public.

14      I have to consider the kinds of sentences available and

15   the conditions that can be imposed as well as the

16   recommendation in the guidelines.   Of course, as we are well

17   aware, the guidelines in this case call for 180 to 210 months.

18      Finally, I must consider if the sentence that I impose

19   avoids unwarranted sentencing disparities for those found

20   guilty of similar conduct.   The need for restitution, I have

21   considered that as well.

22      In this case, I agree with the recommendation provided by

23   the United States.

24      I am going to sentence you, Mr. Turner, to 188 months.

25   That is almost to the low end of the guideline range, but

1    because of the position of trust that you held with these

2    victims, I just don't believe that this is a low end of

3    guideline range case.

4        I'm going to impose a sentence of 188 months, followed by

5    ten years of supervised release.

6        At this time, I'm going to read the sentence and then,

7    after that, we can talk briefly about any rights to appeal.

8        So pursuant to the Sentencing Reform Act of 1984, as

9    modified by the relevant case law, the Court finds the

10    following sentence is sufficient, but not greater than

11    necessary, to comply with the purposes set out in 18 U.S.C.

12    3553(a).

13        Accordingly, it is the judgment of this Court that the

14    defendant, Jordan Ryan Turner, is hereby committed to the

15    custody of the Bureau of Prisons to be imprisoned for a term

16    of 188 months.

17        It is recommended to the Bureau of Prisons that the

18    defendant participate in the sex offender treatment program.

19        It is recommended to the Bureau of Prisons that the

20    defendant participate in a mental health treatment program.

21        It is recommended to the Bureau of Prisons that the

22    defendant participate in a substance abuse treatment program.

23        I will also recommend that Mr. Turner be housed as close

24    as possible to Pineville, Kentucky.  Of course, I can't direct

25    the Bureau of Prisons to send you to a specific facility, but

1    they will review my recommendations and take them into

2    consideration, so that's the best I can do in that regard.

3        Upon release from imprisonment, you'll be placed on

4    supervised release for a period of ten years.

5        Within 72 hours of release from the custody of the Bureau

6    of Prisons, you must report in person to the probation office

7    in the district in which you are released.  While on

8    supervised release, the defendant must not commit another

9    federal, state, or local crime.

10       Must comply with the mandatory and standard conditions

11   set forth in the judgment and commitment order that have been

12   adopted by the Court, and must comply with the following

13   additional conditions:

14       You must not possess a firearm, destructive device,

15   ammunition or dangerous weapon.

16       You must refrain from any unlawful use of a controlled

17   substance.  You must submit to one drug test within 15 days of

18   release from imprisonment, and at least two periodic drug

19   tests thereafter.

20       In addition, you must comply with the following special

21   conditions as adopted by the Court:

22       You must not incur new credit charges or open additional

23   lines of credit without the approval of the probation office

24   unless you're in compliance with any installment payment plan.

25   You must abstain from the use of alcohol completely and

1   totally.  You must refrain from obstructing, or attempting to

2   obstruct, or tamper in any fashion with the efficiency and

3   accuracy of any prohibited substance testing which is required

4   as a condition of this release.

5      You must submit your person, property, house, residence,

6   vehicle, papers, computers, and other electronic

7   communications or data storage devices to a search conducted

8   by the United States Probation Office.  Failure to submit to a

9   search may be grounds for revocation of your release.

10      You must warn any other occupants that the premises may

11  be subject to search pursuant to this condition.  An officer

12  may conduct a search pursuant to this condition only when

13  reasonable suspicion exists that you have violated a condition

14  of your supervision and that the areas to be searched contain

15  evidence of the violation.  Any search must be conducted at a

16  reasonable time and in a reasonable manner.

17      The sex offender treatment conditions.  You must

18  participate in a program for treatment of mental health and

19  sexual disorders.  You must undergo a sex offender risk

20  assessment, psychosexual evaluation, and/or other evaluation

21  as needed.  You must be subject to periodic polygraph

22  examinations and/or computer voice stress analysis testing at

23  the direction and/or direction of probation office.

24      You must follow the rules and regulations of the sex

25  offender treatment program as implemented by the probation

56

1    office.   Your residence and your employment must be

2    pre-approved by the probation officer and in compliance with

3    state and local law.   You must not frequent, volunteer or

4    work at places where children under the age of 18 congregate.

5    For example, playgrounds, parks, daycare centers, public

6    swimming pools, youth centers, video arcade facilities unless

7    approved by the probation officer.   You must have no contact

8    with the victims in this case.

9         You must not associate or have verbal, written,

10   telephonic, or electronic communication with any person under

11   the age of 18 without permission of the probation officer.

12        This provision does not encompass persons under the age

13   of 18 such as ticket venders, cashiers, waiters, et cetera,

14   with whom you may deal in order to obtain ordinary and usual

15   commercial services.

16        You must not possess, listen to, go to locations where

17   any form of pornography, sexually stimulating performances or

18   sexually oriented materials, items or services are available.

19        You must not possess or use a device capable of creating

20   pictures or video without the approval of your probation

21   officer.

22        You must not rent or use a post office box, or storage

23   facility without the approval of the probation officer.

24        You must register as a sex offender as prescribed by law.

25   You must not possess or use a computer, or any device with

1     access to any online computer service at any location,

2     including places of employment, without the prior written

3     approval of the probation office.  This includes any Internet

4     service provider, bulletin board system, or other public or

5     private network or email system.

6        You must consent to the U.S. Probation Office conducting

7     unannounced examinations of your computer systems and internal

8     or external storage devices, which may include retrieval and

9     copy of all memory from hardware, software in or removal of

10     such systems for the purpose of conducting a more thorough

11     inspection, and will consent to having installed on your

12     computer any hardware or software to monitor your computer use

13     or prevent access to particular materials and to consent to

14     periodic inspection of any such installed hardware or software

15     to ensure it is functioning property.

16        You must provide the U.S. Probation Office with accurate

17     information about your entire computer system.  Hardware and

18     software, and internal, external storage devices, all

19     passwords used by you and will abide by all the rules of the

20     computer restriction and monitoring program.

21        You must provide the probation office with access to any

22     requested financial information.  This special condition for

23     financial disclosure is recommend as a means to allow the U.S.

24     Probation Office to monitor purchases of electronic and/or

25     peripheral devices as well as any internet service, either

1    subscribed to or accessed by you.

2        So restitution has not been requested in this case.

3    Based upon your current financial situation, the Court waives

4    the fine in this matter.  Is it further ordered that you will

5    pay to the United States a special assessment of $100, which

6    shall be due at payable immediately.

7        The Court waives the supplemental $5,000 special

8    assessment as to 18 U.S.C. 3014(a), given the finding that you

9    are indigent.

10       You shall forfeit your interest in property set forth in

11   the forfeiture allegation.

12       So at this time I'm going to ask counsel -- first, even

13   if the guideline range had not been calculated correctly, the

14   Court would have imposed this same sentence based on the

15   3553(a) factors.

16       Let me ask if the parties have any objection to the

17   sentence I just pronounced, or the special conditions imposed

18   that have not been previously raised.

19       First, on behalf of Mr. Turner.

20           MR. NEWLAND:  No, objection, Your Honor.

21           THE COURT:  Okay.  Mr. Rosenberg.

22           MR. ROSENBERG:  Your Honor, we only preserve the

23   indigency, we would preserve this issue.  We read the PSR as

24   not affirmatively making a finding of indigency, but rather

25   that Mr. Turner cannot pay the guideline fine, which I believe

1    was 40,000 to 250,000, so we would just like to preserve that

2    for the record; but otherwise no further objections.

3            THE COURT:   Certainly.   And I will make some findings

4    for the record that, you know, Mr. Turner is unemployed.   He

5    has been incarcerated for an extended period of time.   He is

6    facing an extended period of incarceration, and then ten years

7    of supervised release with also some significant restrictions

8    on where he can live and work, so I will make the finding that

9    he is indigent and unable to pay that fine.

10           Certainly, at this time, and I think that's all I have to

11   go on.   And the Court did not, in any way, consider his

12   ability to obtain retained counsel in making any determination

13   on whether he is indigent or not, or his ability to pay the

14   $5,000.

15           MR. ROSENBERG:   If I could.

16           Just to clarify, it was not the government's suggestion

17   that the mere retention was somehow dispositive of that issue.

18   It was only to flag that, unlike many cases before the Court

19   where there is appointed counsel, there is a financial

20   affidavit that has been put forth and an affirmative finding

21   of indigence, so it was just to flag that that had not

22   happened in this case.

23           It was not to suggest that, that retention of counsel

24   ipso facto means there could not be indigence at this point.

25           THE COURT:   Sure.   I think the presentence report

1   makes it pretty clear what his current financial situation is.

2       Are there any arguments that the United States believes

3   you have made that I failed to address in rendering the

4   sentence?

5           MR. ROSENBERG:  No, Your Honor.  Thank you.

6           THE COURT:  Same question for you, Mr. Newland.

7           MR. NEWLAND:  Your Honor, we did ask if the Court

8   would recommend Mr. Turner receive the maximum amount of

9   halfway house time placement allowable under the BOP program

10  Understanding that it is just a recommendation.  It is not

11  binding on the BOP.

12          THE COURT:  Any response to that, Mr. Rosenberg?

13          MR. ROSENBERG:  We think that matter is best left to

14  the discretion of the Bureau of Prisons.

15          THE COURT:  I'll recommend that he be assessed for

16  halfway house placement and, clearly, for the record, he has

17  no criminal history prior to this, and that ought to put him

18  in really good position for getting any favorable

19  considerations by the Bureau of Prisons, so I'll leave the

20  record at that.

21      Having addressed, then, all the remaining issues with the

22  sentence, the sentence is hereby ordered imposed as stated and

23  an appropriate judgment shall be entered.

24      So, Mr. Turner, as far as your rights to appeal, I

25  believe that you waived a number of rights to appeal in your

1   plea agreement.

2        But you did retain certain rights to appeal.  In the

3   event that you would like to file an appeal, you'll have 14

4   days from me entering the judgment in this case.  Judgment

5   will be enter likely tomorrow, which would start your 14 days

6   ticking.

7        I am certain that Mr. Newland would be happy to assist

8   you in filing a notice of appeal, should you like to do that,

9   or the clerk of court.  If you are unable to pay for the cost

10  of appeal, you may apply for leave as a pauper to get those

11  filing fees waived.

12       At this time, I'll ask our clerk to publish -- I think

13  she already has -- your advice of rights to appeal.  Please

14  take whatever time you need to go over that with Mr. Newland.

15       We can turn on the background noise.  You can put your

16  headsets on, if you would like to discuss that.  And when you

17  are ready to proceed, just let me know.

18       (Off-the-record discussion.)

19            THE COURT:  All right.  Have you gone over the advice

20  of rights to appeal with your counsel, Mr. Turner?

21            THE DEFENDANT:  Yes, I have.

22            THE COURT:  Okay.  Do you understand your rights to

23  appeal?

24            THE DEFENDANT:  Yes.

25            THE COURT:  Do you need any additional -- do you have

1     any additional questions either for the Court or for

2     Mr. Newland?

3                THE DEFENDANT:  No, I don't, Your Honor.

4                THE COURT:  Mr. Newland, do you believe that

5     Mr. Turner understands his rights to the appeal?

6                MR. NEWLAND:  Yes, Your Honor.

7                THE COURT:  Okay.  So what will happen next,

8     Mr. Turner, is you will be remanded back to the custody of the

9     U.S. Marshal.  In nonCOVID times, it would normally take four

10    to six week for them to designate you to a Bureau of Prisons

11    facility.  But it has been taking longer than that, so it

12    might take longer than that in your case as well.

13         But after the Bureau of Prisons does their assessment,

14    they will then designate you to a facility and you will be

15    transported to the Bureau of Prisons facility.

16         Counsel, anything further that we need to address in this

17    hearing?

18         Mr. Newland.

19                MR. NEWLAND:  Just briefly, Your Honor.  If I could

20    have, after the hearing, five minutes with Mr. Turner before

21    he's taken back.

22                THE COURT:  Okay.  That's fine.  I have another

23    hearing that I'm running drastically late on.

24                MR. NEWLAND:  Oh, then I can --

25                THE COURT:  Oh, no.  No.  That's fine.

1          MR. NEWLAND:  I can meet him in the --

2          THE COURT:  No.  I have a 2:30.

3          MR. NEWLAND:  I can meet him in the marshal's holding

4     area.

5          THE COURT:  If that's difficult for you, you can have

6     five minutes now.  But if it's just as easy to go to the

7     holding cell, that would be ideal.

8          MR. NEWLAND:  Thank you, Your Honor.

9          THE COURT:  Anything further, Mr. Rosenberg, on

10    behalf of the United States?

11         MR. ROSENBERG:  Nothing for the U.S.  Thank you.

12         THE COURT:  Okay.  In closing, again, the Court just

13    wants to thank the family for being here.  I know this is such

14    a terrible time for you, and it really is a tragedy for so

15    many people.

16     I can understand and sympathize with how difficult this

17    must be.  Note.  I'm sure Mr. Turner is going to need your

18    support going forward during his time of incarceration and

19    after he is out serving his term of supervised release.

20     And I hope that you'll continue to support him and I feel

21    confident that you will.  Again, I do thank you for being here

22    and certainly wish you all the very best of luck.

23     Mr. Turner, your sentence has been set.  It is a long

24    sentence.  It is really just a tragedy for all sides.  You

25    have many many positive attributes, and that is clear to the

1    Court.  There were a lot of really good people who spoke on

2    your behalf and the Court credits them greatly and I believe

3    what they say.

4         But the fact of the matter is, there was another side,

5    and whether that was just in the throes of your addiction or

6    what, that has caused a lot of damage and harm to people as

7    well.

8         And so that's just part of the balance that the Court has

9    to weigh in determining what the final sentence is in each

10   case.  It is clear to the Court that you're very remorseful

11   and that you lived a really model life up until this time.

12        None of us wants to be judged by the very worse moment of

13   our lives.  And the Court understands that this is that moment

14   for you.  But that there is a lot more to you, Mr. Turner,

15   than just the situation in this case.  That's been made clear

16   by the dozens of pages of letters that have been submitted to

17   the Court on your behalf and the statements that I have heard

18   from the wonderful people in your family and in your friend

19   circle and from your church.

20        So I know that even though it is a long sentence, you're

21   a young person and you're going to go have an opportunity to

22   live a meaningful and substantial life after this is over.  I

23   feel confident that you will, and that you will turn this

24   situation, as you already have, into something good.  And I do

25   certainly wish you Godspeed.  Good luck to you.

1      And, counsel, thank you for your service in this case.

2      We'll be in recess until my next hearing.

3      (Proceedings concluded at 3:53 p.m.)

4

5                    C E R T I F I C A T E

6          I, KIMBERLEY ANN KEENE, RPR, certify that the
   foregoing is a correct transcript from the record of
7  proceedings in the above-entitled case.

8

9  Kimberley Ann Keene, RPR              November 12, 2020
   KIMBERLEY ANN KEENE, RPR              Date of Certification
10  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25